IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

MICHAEL G. SANTENS,

      Plaintiff,

v.                                               **Civil Action No. 3:13CV226**

PROGRESSIVE GULF INSURANCE CO.,

      Defendant.

## MEMORANDUM OPINION

This matter comes before this Court for disposition of Plaintiff Michael G. Santens's and Defendant Progressive Gulf Insurance Co.'s ("Progressive") cross motions for summary judgment. (ECF Nos. 34, 37.) The Court heard oral argument and, after limited follow-up briefing, the issues have been fully addressed. Accordingly, this matter is ripe for disposition. The Court exercises jurisdiction pursuant to 28 U.S.C. § 1332.[1]

For the reasons that follow, the Court will grant Santens's cross motion for summary judgment and will deny Progressive's cross motion for summary judgment. The Court finds that no genuine dispute as to any material fact exists and that Santens is entitled to judgment as a matter of law. The Court will enter a declaratory judgment that Progressive must provide Santens with five hundred thousand dollars ($500,000) in uninsured/underinsured motorist ("UM") coverage.

---

[1] Diversity exists between the parties and the amount in controversy exceeds $75,000. 28 U.S.C. §1332.

## I. Factual and Procedural Background

### A.   Undisputed Facts[2]

#### 1.   The Accident

This insurance coverage dispute arises from a September 10, 2011 car accident involving Santens and Patricia Booth, a non-party ("the Accident"). Santens suffered "severe injuries" in the Accident. (Compl. ¶ 7, ECF No. 1.) Because Booth's liability insurance provided less than five hundred thousand dollars ($500,000) coverage, Santens sought five hundred thousand dollars ($500,000) UM coverage from Progressive, his insurer.

#### 2.   The Policy at Issue

Effective June 25, 2007 to June 25, 2008, Progressive provided Santens with motorcycle insurance pursuant to Policy Number 31382124-0 (the "2007 Policy"). The 2007 Policy Declaration provided Santens, the named insured, with the following coverage: (1) fifty-thousand dollars ($50,000) each person/one hundred thousand dollars ($100,000) each accident in bodily injury liability ("BI") coverage; and, (2) fifty-thousand dollars ($50,000) each person/one hundred thousand dollars ($100,000) each accident in UM coverage.[3] Santens did not reject matching UM coverage for the 2007 Policy. (Def.'s Supp'l Br. 4, ECF No. 48 ("Progressive concedes that . . . [the 2007 Policy] was issued with matching [UM] and liability limits.").) The 2008 Policy, effective June 25, 2008 to June 25, 2009, provided Santens with the same BI and UM coverage as the 2007 Policy.

---

[2] Progressive's initial briefing suggests disputed facts exist. Counsel for Santens and Progressive each confirmed during oral argument that no dispute as to any material fact exists and that this Court may properly grant summary judgment. This Court agrees. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[3] Santens's policy included property damage coverage. The parties dispute only the bodily injury portion of Santens's policy.

On April 6, 2009, and during the 2008 Policy year, Santens contacted Progressive by phone to request a change to his BI coverage ("April 2009 Call"). Santens sought to increase his BI coverage to five hundred thousand dollars ($500,000) combined single limit ("CSL") in order to comply with an umbrella liability insurance policy. During the call, neither Santens nor the Progressive representative discussed or mentioned Santens's UM coverage.

Following the April 2009 Call, Progressive issued a 2008 amended declaration ("2008 Amended Declaration"). The 2008 Amended Declaration specifies the following coverage: (1) five hundred thousand dollars ($500,000) CSL each accident BI and property damage; and, (2) fifty-thousand dollars ($50,000) each person/one hundred thousand dollars ($100,000) each accident in UM coverage. Santens's 2009 Policy, effective June 25, 2009 to June 25, 2010, his 2010 Policy, effective June 25, 2010 to June 25, 2011, and his 2011 Policy, effective June 25, 2011 to June 25, 2012 and in effect at the time of the Accident, denote the same coverage as the 2008 Amended Declaration.[4] Progressive correctly identifies the policy as a renewal.[5]

Because Booth's liability insurance provided less than five hundred thousand dollars ($500,000) coverage, Santens sought five hundred thousand dollars ($500,000) UM coverage from Progressive for the injuries he suffered in the Accident. Progressive denied owing that amount of UM coverage.

---

[4] On June 21, 2011, Santens contacted Progressive to change his address. On July 8, 2011, Progressive issued a declaration reflecting the address change. The July 8, 2011 Declaration states the same BI and UM coverage amounts as the 2008 Amended Declaration, 2009, 2010, and 2011 Policy Declarations.

[5] Santens indicated at oral argument that whether the policy qualifies as renewal or new makes no difference in the Court's legal analysis. The lack of a rejection may make this position sustainable, but this Court need only note that the policy at issue qualifies as a renewal. *See Elliott v. Liberty Mut. Ins. Co.*, No. 91-1264, 1993 WL 2671, at *3-4 (4th Cir. Jan. 7, 1993); *Jefferson v. Harco Nat'l Ins. Co.*, No. 3:08CV486, 2009 WL 1765670, at *9-10 (E.D. Va. June 18, 2009).

### B.  Procedural History

In April of 2013, Santens filed his Complaint for declaratory judgment that Progressive provide him with five hundred thousand dollars ($500,000) in UM coverage for the Accident. Progressive answered and denied that it owed five hundred thousand dollars ($500,000) in UM coverage.  Progressive contends that it owes fifty-thousand dollars ($50,000) per person/one hundred thousand dollars ($100,000) per accident in UM coverage, consistent with the face of the policy declarations from 2009-2012.

The parties filed cross motions for summary judgment.  (ECF Nos. 34, 37.)  Santens asks this Court to find that Progressive must provide Santens with five hundred thousand dollars ($500,000) in UM coverage for the Accident, less any credit for liability coverage.  Progressive seeks a declaration that it must supply UM coverage in the amount of fifty-thousand dollars ($50,000) each person/one hundred thousand dollars ($100,000) each accident.  The Court has heard oral argument and received follow up briefing.

## II.  Standard of Review

### A.  Summary Judgment

Summary judgment under Rule 56 is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *Anderson*, 477 U.S. at 248-50. Once a party has properly filed evidence supporting the motion for summary judgment, the nonmoving party may not rest upon mere allegations in the pleadings, but instead must set forth specific facts illustrating genuine issues for trial. *Celotex Corp.*, 477 U.S. at 322-24.  These facts must be presented in the form of exhibits and sworn affidavits. Fed. R. Civ. P. 56(c).

4

A court views the evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. Whether an inference is reasonable must be considered in conjunction with competing inferences to the contrary. *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 818 (4th Cir. 1995) (citation omitted). Nonetheless, the nonmoving "party is entitled 'to have the credibility of his evidence as forecast assumed.'" *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (quoting *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)). Ultimately, the court must adhere to the affirmative obligation to bar factually unsupportable claims from proceeding to trial. *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (citing *Celotex Corp.*, 477 U.S. at 323-24). Where the court is faced with cross motions for summary judgment, as in the instant case, the court must review each motion separately on its own merits. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003).

## B.    Statutory Construction

The familiar canons of statutory construction govern the parties' dispute regarding the interpretation of the Virginia UM statutes at issue.[6] A court must first read the plain language of a statute to determine its meaning. *In re Total Realty Mgmt., LLC*, 706 F.3d 245, 251 (4th Cir. 2013) (citing *Crespo v. Holder*, 631 F.3d 130, 133 (4th Cir. 2011)). Absent ambiguity, the plain language must be applied. *Waldburger v. CTS Corp.*, 723 F.3d 434, 442 (4th Cir. 2013) (citing *United States v. Abdelshafi*, 592 F.3d 602, 607 (4th Cir. 2010)).

Additionally, courts interpreting the UM statute relevant in this case instruct that "Section 2206 was intended to protect those injured by uninsured or underinsured motorists by requiring that they be adequately compensated for their injuries." *Jefferson*, 2009 WL 1765670, at *3

---

[6] The Court reviews Virginia's UM coverage requirements outlined in the following two statutes:  (1) Section 38.2-2206(A) of the Code of Virginia ("Section 2206(A)"); and, (2) Section 38.2-2202(B) of the Code of Virginia ("Section 2202(B)").

(citing *Grossman v. Glen Falls Ins. Co.*, 176 S.E.2d 318, 320-21 (Va. 1970); *White v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 913 F.2d 165, 169 (4th Cir. 1990)). "UM Statute § 2206 is to be applied liberally in order to accomplish its intended purpose of affording relief to injured persons, and any ambiguity should be construed in favor of the insured." *Id.* at *5 (citations omitted).

### III. Analysis

This Court evaluates a factual circumstance not previously reported by any court applying Virginia law. Unlike other cases, Santens never rejected matching limits when offered in 2007 and never otherwise rejected matching limits prior to increasing his BI coverage in 2009.[7] Santens and the Progressive representative both failed to address UM coverage during the later April 2009 Call. For the reasons stated below, the liberal construction favoring relief to injured persons which courts must give to Section 2206(A), the plain language of Section 2206(A), and the April 2009 Call's silence regarding UM coverage, together mandate that Progressive supply Santens with five hundred thousand dollars ($500,000) in UM coverage.

### A.    Applicable Statutory Law:  Uninsured/Underinsured Motor Vehicle Coverage

"Virginia law requires insurers issuing or delivering automobile liability policies in Virginia to provide UM/UIM coverage." *Melton v. Discover Prop. & Cas. Ins. Co.*, 760 F.

---

[7] Progressive concedes that the facts before the Court in this case differ from the cases relied on by the parties, "because in this case the 'new' policy of insurance issued by Progressive to Mr. Santens (the 2007 Policy) was issued with matching UIM and liability limits." (Def.'s Supp'l Br. 4.)

Supp. 2d 633, 635 (W.D. Va. 2011) (citing Va. Code Ann. § 38.2-2206 (West 2013)).[8] Two

statutes stand before this Court. Section 2206(A) and Section 2202(B) constitute the applicable

law in this case.

### 1.   Section 2206(A):  The Match or Reject Provision

The first, so-called "Match or Reject" provision, clearly mandates matching liability and

UM coverage when requiring:  (1) that the amount of UM insurance equal the amount of BI

insurance unless specifically rejected by the policyholder for lesser amounts; and, (2) that, even

if a policyholder rejects matching coverage, the insured may not elect limits below the minimum

required by Virginia law.  § 38.2-2206(A).  The plain language of Section 2206(A) compels UM

coverage that matches liability coverage unless a named insured rejects matching coverage and

elects a lesser amount.

The statute unambiguously outlines the mandatory nature of the matching requirement:

"Those [UM] limits *shall equal* but not exceed the limits of the liability insurance provided by

the policy, *unless* any one named insured *rejects* the additional uninsured motorist insurance

coverage by notifying the insurer as provided in subsection B of § 38.2-2202." *Id.* (emphasis

---

[8] "Virginia Code § 38.2-2206 treats UM's and UIM's as the same and the terms are generally used interchangeably.  A UM is a motorist without any insurance coverage while a UIM is a motorist who has less liability insurance coverage than the UM/UIM coverage of the injured party." *Melton*, 760 F. Supp. 2d at 634 n.2 (citation omitted).  Booth appears to qualify as an UIM because she has less insurance than Santens, but this Court refers to the disputed coverage as "UM" coverage to ease readability.

added);[9] *see USAA Cas. Ins. Co. v. Alexander*, 445 S.E.2d 145, 146 (Va. 1994) (finding that Section 2206(A) unmistakably "requires an insurer . . . to provide UM coverage in limits equal to the limits of liability . . . unless the insured rejects that level of coverage . . . ."); *see also Melton*, 760 F. Supp. 2d at 635 ("Under § 38.2-2206, an insured's UM/UIM coverage limits *will equal* his liability coverage limits unless he rejects this coverage and elects a lesser amount.") (emphasis added).

Section 2206(A) states its requirement without limiting itself to "new" versus "renewal" policies, unlike the Section 2202(B) notice provision, discussed below, that limits itself to new policies. A plain reading of the statutory language makes it applicable to all policies issued. Section 2206(A) states that "*no* policy or contract" of motor vehicle bodily injury liability or property damage insurance "shall be issued or delivered in this Commonwealth" unless the policy contains a provision to provide all sums the insured is legally entitled to recover. § 38.2-2206(A) (emphasis added). Thus, under the plain language of Section 2206(A), the Match or Reject provisions apply to the renewal policy at bar.

---

[9] Section 2206(A) also requires minimum UM coverage, a provision not at issue here because Santens consistently agreed to above-minimum UM coverage. The required minimum coverage provision reads as follows:

> *[N]o policy or contract* of bodily injury or property damage liability insurance relating to the ownership, maintenance, or use of a motor vehicle *shall be* issued or delivered in this Commonwealth to the owner of such vehicle . . . *unless it contains* an endorsement or provisions undertaking to pay the insured all sums that he is legally entitled to recover as damages from the owner or operator of an uninsured motor vehicle, *within limits not less than the requirements of § 46.2-472* [of one person/twenty-five thousand dollars ($25,000)/fifty-thousand dollars ($50,000) per accident coverage].

§ 38.2-2206(A) (emphasis added); *see also* Va. Code Ann. § 46.2-472(3) (West 2013).

2.     **Section 2202(B):  The Notice Statute**

The second statute at issue, Section 2202(B), addresses the notice that must accompany a

new policy informing the policy holder about the amount of UM coverage available to him or

her.  Limiting the notice requirement to new policies, Section 2202(B) delineates, verbatim, the

notice insurers must give to a policy holder regarding the match or reject provision:

> *No new policy or original premium* notice of insurance covering liability arising
> out of the ownership, maintenance, or use of any motor vehicle shall be issued or
> delivered unless it contains the following statement printed in boldface type, or
> unless the statement is attached to the front of or is enclosed with the policy or
> premium notice:
>
> IMPORTANT NOTICE
>
> IN ADDITION TO THE INSURANCE COVERAGE REQUIRED BY LAW TO
> PROTECT YOU AGAINST A LOSS CAUSED BY AN UNINSURED
> MOTORIST, IF YOU HAVE PURCHASED LIABILITY INSURANCE
> COVERAGE THAT IS HIGHER THAN THAT REQUIRED BY LAW TO
> PROTECT YOU AGAINST LIABILITY ARISING OUT OF THE
> OWNERSHIP, MAINTENANCE, OR USE OF THE MOTOR VEHICLES
> COVERED BY THIS POLICY, AND YOU HAVE NOT ALREADY
> PURCHASED UNINSURED MOTORIST INSURANCE COVERAGE EQUAL
> TO YOUR LIABILITY INSURANCE COVERAGE:
>
> 1. YOUR UNINSURED AND UNDERINSURED MOTORIST INSURANCE
> COVERAGE HAS INCREASED TO THE LIMITS OF YOUR LIABILITY
> COVERAGE AND THIS INCREASE WILL COST YOU AN EXTRA
> PREMIUM CHARGE; AND
>
> 2. YOUR TOTAL PREMIUM CHARGE FOR YOUR MOTOR VEHICLE
> INSURANCE COVERAGE WILL INCREASE IF YOU DO NOT NOTIFY
> YOUR AGENT OR INSURER OF YOUR DESIRE TO REDUCE COVERAGE
> WITHIN 20 DAYS OF THE MAILING OF THE POLICY OR THE PREMIUM
> NOTICE, AS THE CASE MAY BE. THE INSURER MAY REQUIRE THAT
> SUCH A REQUEST TO REDUCE COVERAGE BE IN WRITING.
>
> 3. IF THIS IS A NEW POLICY AND YOU HAVE ALREADY SIGNED A
> WRITTEN REJECTION OF SUCH HIGHER LIMITS IN CONNECTION
> WITH IT, PARAGRAPHS 1 AND 2 OF THIS NOTICE DO NOT APPLY
> . . . .

Va. Code Ann. § 38.2-2202(B) (West 2013) (emphasis added).

The notice requirement for *new* policies is mandatory.  *See id.* ("No *new* policy or original premium notice of insurance covering liability arising out of the ownership, maintenance, or use of any motor vehicle *shall be issued or delivered unless it contains the following statement . . . .*") (emphasis added).

The mandatory notice provision, however, expires after twenty days.  Section 2202(B) explicitly provides that, after twenty days, an insurance company need not notify a policy holder of the match or reject requirements in any "renewal policy" or subsequent "premium notice:"

> *After twenty days*, the insurer shall be *relieved of the obligation* imposed by this subsection *to attach or imprint the foregoing statement to any subsequently delivered renewal policy*, extension certificate, other written statement of coverage continuance, *or to any subsequently mailed premium notice.*

*Id.* (emphasis added); *see Atkinson v. Penske Logistics, LLC*, 596 S.E.2d 518, 521 (Va. 2004) ("[n]otice under Code § 38.2-2202(B) is not applicable to renewal policies") (citing *Gov't Emps. Ins. Co. (GEICO) v. Hall*, 533 S.E.2d 615, 617-18 (Va. 2000)).[10]

The obligation to provide the UM coverage notice does not extend to renewals, but neither Section 2206(A) nor Section 2202(B) contemplates the circumstance at bar:  whether the insurer must continue to provide matching UM coverage for renewals where no prior rejection exists.  This Court answers that question in the affirmative.[11]

---

[10] *See Canal Ins. Co. v. Lebanon Ins. Agency, Inc.*, 543 F. Supp. 2d 521, 524 (W.D. Va. 2008) (Section 2202(B) "limits its application to *new* policies of insurance.") (citing § 38.2-2202(B) (footnote omitted)); *Atkinson*, 596 S.E.2d at 521; *Hall*, 533 S.E.2d at 617; *Alexander*, 445 S.E.2d at 147 ("[O]nce the insured has effectively reduced the level of coverage by notifying the insurer, in accordance with [Section 2202(B)], the waiver and reduction of coverage remains in effect during subsequent renewals of the policy.").

[11] Progressive attempts to escape a plain reading of Section 2206(A) by suggesting that the mention of Section 2202(B) in Section 2206(A) limits the application of Section 2206(A) to new policies because Section 2202(B) does not apply to renewal policies.  As explained in greater detail below, given the liberal reading toward coverage this Court must give the UM statute, this argument fails.

**B.**   **Because Santens Never Rejected Matching UM Coverage, Progressive Must Supply UM Coverage in the Amount of Five Hundred Thousand Dollars ($500,000)**

    **1.**   **Introduction**

The lack of any rejection or waiver drives this Court's analysis.  At base, Santens emphasizes that no explicit waiver happened in 2007, while Progressive highlights that Section 2202(B) allowed Progressive not to give notice in 2009.  Both are correct.  Progressive's arguments falter later in time, however, because they fail to incorporate that Section 2206(A)'s matching requirement clearly applies to all policies, including renewals such as the policy at bar. Moreover, Progressive cannot overcome the fact that, on this record, the April 2009 Call does not evince even an ambiguous rejection because both parties simply failed to address UM coverage altogether.

Given the liberal construction favoring relief applicable to the UM statute, this Court finds that the silence of both parties on the matching UM coverage in 2009 when Santens increased his liability limits to five hundred thousand dollars ($500,000) cannot, as a matter of law, constitute Santens's first rejection of matching UM limits.  In the absence of a rejection, any silence regarding coverage should result in the "ambiguity [being] construed in favor of the insured." *Jefferson*, 2009 WL 1765670, at *5 (citations omitted).  Virginia law requires Progressive to supply Santens with UM coverage matching his five hundred thousand dollar ($500,000) BI limit for the Accident.

---

First, a straightforward reading of Section 2206(A) makes the mandatory nature of the matching requirement manifest.  Second, neither statute contains language suggesting that Section 2202(B) exempts the Match or Reject provision from renewal policies.  The opposite is true.  Finally, the undisputed facts of this case fall outside the purview of Section 2202(B) in any event.  Santens never rejected matching coverage even when Progressive properly followed the notice required in Section 2202(B).

### 2.    The Factual Record Lacks a Written Waiver or Any Evidence of an Explicit Rejection When Progressive First Issued the Policy in 2007

Neither party disputes that this record entirely lacks an explicit rejection or waiver.[12]  In 2007, the only moment in this case when Sections 2206(A) and 2202(B) required Progressive to provide Santens with the Match or Reject Notice, Santens did not reject matching liability and UM coverage, orally or in writing.  Santens's 2007 Declaration and 2008 Declaration reflect matching UM and BI coverage, consistent with the default requirement found in Section 2206(A).  Indeed, in 2007 and through 2008, Santens agreed to fifty-thousand dollars ($50,000) in UM coverage, which is double the minimum UM coverage required by Virginia law. (*Compare* 2007 Policy Decl. (listing UM coverage of fifty-thousand dollars ($50,000) each person/one hundred thousand dollars ($100,000) each accident) *with* § 46.2-472(3) (listing statutory minimum UM coverage of twenty-five thousand dollars ($25,000) per person/fifty-thousand dollars ($50,000) each accident)).

### 3.    The Factual Record Lacks an Ambiguous Rejection Because Both Parties Were Altogether Silent About UM Coverage During the April 2009 Call

While Progressive sometimes suggests in briefing that Santens's testimony about the April 2009 Call reflects an intent to keep UM limits at the then-existing levels, the record falls well short of such a factual finding on summary judgment review.  In 2009, Section 2202(B) did not require Progressive to send any notice about Section 2206(A)'s Match or Reject requirement because twenty days from the 2007 initial policy had long expired during this renewal event. However, unless an explicit waiver existed previously, Progressive needed some contemporaneous indicia that Santens intended a waiver to be implemented in 2009 in order to allow Progressive to alter the matching coverage.

---

[12] The record shows that Progressive looked for a waiver form when evaluating the claim but does not indicate that one was ever located.

None exists here. First, as noted above, all interactions prior to the April 2009 Call demonstrate that the parties agreed to matching coverage above the minimum required by law. No explicit rejection or waiver exists. Second, the transcript of the telephone call lacks any mention of UM limits, much less any mention to keep UM limits the same while increasing liability limits. Santens consistently testified that his sole intent during the call was to match liability limits to the amount required by his umbrella policy. Santens's deposition testimony cannot support a factual finding, considering inferences in favor of Progressive, that even an ambiguous rejection occurred during the April 2009 Call. Any reasonable inference supports only a finding that neither participant contemplated the effect of the change on UM limits, meaning matching coverage would have to apply under Section 2206(A). Indeed, Progressive candidly suggests elsewhere that both parties failed to address the effect of a liability change on UM limits altogether.[13]

Thus, this Court finds that this record evinces no explicit or ambiguous rejection of matching BI and UM coverage.

## C.    **Applicable Case Law:  A Rejection or Waiver Must Occur**

Progressive nonetheless suggests that developing case law can support a legal conclusion that a rejection of matching limits occurred. Progressive asks this Court to look to the mutual intent of the parties to evaluate whether a rejection occurred during the April 2009 phone call

---

[13] On summary judgment, the record bears out this latter position readily. Not only is the telephone transcript itself bereft of any UM limits discussion, Progressive's own employee reviewing the claim twice noted that no conversation occurred about UM limits one way or the other. (Rasmussen Decl. Ex. B claims notes ("Claims Notes") 14 ("There was no discussion at all about the UM/UIM limits as the caller [sic] stated liability limits [sic] He didn't state UM/UIM") (capitalization corrected), ECF No. 35; *see also id.* at 15 ("There was never any request or discussion about the UM/UIM coverage at all.") (capitalization corrected).) Neither party disputes that these are accurate claims file notes. While these notes do not substitute for this Court's findings of fact, they do lead to a reasonable inference that no UM discussion occurred. Indeed, they support a finding, as described below, that no meeting of the minds occurred to differentiate BI from UM coverage limits.

and afterward.[14]  Despite the fact that all cases presented are inapposite because they involve,

contrary to the factual finding above, some form of rejection of matching limits, a review of

relevant case law follows.

### 1.   Early Cases Required an Explicit Rejection or Written Waiver

Early Fourth Circuit case law clearly would have mandated matching coverage.  The

United States Court of Appeals for the Fourth Circuit has found that an explicit rejection

requirement furthers the intended purpose of Section 2206(A) to protect adequately those injured

by uninsured motorists:

> Information that supports an inference by the insurer that the insured intends to
> reject a default level of coverage does not suffice, under Virginia law, as an actual
> "rejection" of that coverage.  The statute's plain language explicitly required [the
> insured] to reject the default coverage by notifying [the insurer] of that rejection.
> Furthermore, the law's explicit rejection requirement is consistent with its
> purpose of affording adequate protection to those insured by underinsured
> motorists.

*White*, 913 F.2d at 169 (citation omitted).

In the same year, the Fourth Circuit quoted *White* when concluding in *Bray v. Insurance*

*Co. of the State of Pennsylvania* that an insured's quiescent acceptance of UM policy limits that

fell below the statutorily-required Virginia minimum could not constitute an insured's

affirmative decision to reject matching UM coverage under the law.  *Bray v. Ins. Co. of Pa.*, 917

F.2d 130, 133-34 (4th Cir. 1990) (finding no notice given and that silence did not constitute

rejection of matching limits).  Indeed, the *Bray* court found that Virginia's statutory

requirements, which, generally, are "as much a part of the policy as if incorporated therein,"

mandated that UM coverage match the one million dollar liability coverage at issue there

---

[14] Progressive agrees that it bears the burden to provide evidence of a rejection.
Progressive's effort to persuade this Court that a rejection occurred here falls short regardless of
whether or not the burden applies.

because the record lacked any rejection by the policy holder.[15] *Id.* at 132 (citation omitted) (internal quotation marks omitted). The lack of an explicit rejection required that the insurer provide matching UM coverage. *Id.* at 133-34 (noting that the policy holder had not rejected matching coverage). More recent decisions "reaffirm" the plain reading of Section 2206: "there must be a rejection or the uninsured and underinsured limits will equal liability limits; intent to reject is insufficient." *Melton*, 760 F. Supp. 2d at 639 (citation omitted) (internal quotation marks omitted).

This Court has before it no explicit waiver or rejection, meaning that *White* and *Bray* would mandate matching coverage at the higher level. Indeed, *Bray*, nearly on all fours with the case at bar, would mandate a finding in Santens's favor.

> **2.   Recent Cases Looking to the Intent of the Parties to Carry Forward a Rejection Into a New Policy Year Do Not Pertain Because None Have Made that Finding Without Some Rejection or Waiver on the Record**

Progressive suggests that subsequent cases alter the legal landscape in a manner requiring a different outcome than *White* and *Bray* would require. Progressive asks this Court to evaluate "more recent case law demonstrat[ing] that there is flexibility in determining whether *a waiver form has in fact expressed a rejection of coverage* by examining the actions of the parties in order to determine their intent." *Jefferson*, 2009 WL 1765670, at *8 (emphasis added). Post-*White* and *Bray* decisions look to the intent of the parties to determine whether a waiver expresses a rejection of matching coverage. *See Jarrell-Henderson v. Liberty Mut. Fire Ins. Co.*, No. 2:07CV432, 2009 WL 347801, at *12 (E.D. Va. Feb. 10, 2009) ("Virginia courts have acknowledged that the mutual intent of the parties is instructive when determining whether a

---

[15] The statutory language at issue in *White* and *Bray* required that the insurer send notice of the right to reject matching UM coverage for both new and renewed policies. Virginia law no longer requires notice to be sent for renewal policies such as the one at bar. *Hall*, 533 S.E.2d at 617 (outlining statutory changes in notice provision); *Atkinson*, 596 S.E.2d at 521-22 (citing *Hall*, 533 S.E.2d at 617-18). This difference does not affect the Court's analysis.

notification has effectively reduced UM coverage.") (citations omitted); *Hall*, 533 S.E.2d at 618 ("[e]xamining the course of dealing between parties").

An analysis of intent does not change this Court's conclusion regarding the need for matching coverage. This record is bereft of any oral or written indication that Santens ever sought to reject matching coverage prior to Progressive changing it in 2009. No waiver form exists. Because Santens never rejected matching coverage, a review of relevant case law does not support Progressive's argument that the prior UM coverage amount should apply. Every case reviewing intent evaluates circumstances surrounding some form of waiver. They do so to discern whether an earlier waiver is sufficiently clear to be carried over into a new policy year. Some cases suggest that a court should turn to intent *only* when at least one clear rejection, or attempt to reject, exists on the record. Because this Court has determined no rejection can be found here, no case cited by the parties allows any finding except that matching coverage should pertain.

### a.   Explicit Rejections

Since *White* and *Bray*, the Fourth Circuit has determined that a rejection in a renewal year can be inferred if a policy holder had been given a choice to reject previously, and clearly had done so. Three cases most prominently discuss the need for an explicit rejection in order for a rejection to carry forward into a subsequent renewal. First, in *Insurance Co. of North America v. MacMillan*, 945 F.2d 729, 731 (4th Cir. 1991), an insured had signed a written rejection, albeit an improperly late and (because it sought no coverage rather than the mandated minimum) excessive one. There, the insured "did explicitly, not merely inferentially, reject all uninsured motorist coverage." *Id.* Despite the untimely and overinclusive rejection, the Fourth Circuit found that the statutory minimum coverage applied, noting that "[t]he written rejection of UM

coverage . . . need not be supplied to the insured by the insurer *if a written rejection has already been signed.*" *Id.* at 730 (emphasis added). Thus, while *MacMillan* allows inferences to be drawn based on intent, it cannot apply to this case because Santens never supplied any waiver or rejection, much less an explicit one. At the time of the April 2009 Call, the parties did not mutually intend to reject matching coverage.

In a second case involving explicit rejections just two years later, *Elliott v. Liberty Mutual Insurance Co.*,[16] the policy holder rejected matching coverage three times. 1993 WL 2671, at *3. Noting the "undisputed fact that [the insured] consistently rejected full UM coverage," the Fourth Circuit found that another rejection was not required even though the policy holder increased liability limits in a subsequent year. *Id.* Citing favorably *MacMillan*, the *Elliott* court reiterated the need for having an explicit rejection on the record. *Id.* The court noted that the Virginia statute requires both notice of the chance to reject matching limits *and a rejection*: "when an insured clearly is given a choice to accept or reject full UM coverage, *and chooses to reject*, the rejection is effective despite the insurer's failure to issue a notice precisely as required [by Section 2202(B)]." *Id.* (citing *MacMillan*, 945 F.2d at 731) (emphasis added). Unlike *Elliott*, Santens never explicitly rejected matching coverage.

Finally, in *Jarrell-Henderson v. Liberty Mutual Fire Insurance Co.*, the court found that an untimely notice seeking UM minimum limits in one year would carry over to the next year's policy. 2009 WL 347801, at *3. The court so found because "[o]nce an insured has reduced the level of coverage, the waiver and reduction of coverage remains in effect during subsequent renewals of the policy." *Id.* at *10 (citation omitted). The court found substantial compliance in

---

[16] Progressive contends that *Elliott* supports a finding that the rejection requirements never apply to renewal policies. However, the findings of the case, and explicit language in *Elliott* itself, confirm otherwise. The *Elliott* court's reasoning clearly rests on the manner of rejection before it, not whether the rejection requirement applied to renewal policies. *See Elliott*, 1993 WL 2671 at *3.

filling out the rejection provision of the form, noting that verbal and written confirmations reflected the parties' mutual understanding that the limits would be lower. *Id.* at *12. Unlike *Jarrell-Henderson*, this record lacks a waiver form altogether. The nature of the verbal and written communication between Santens and Progressive does not remotely mirror those in the *Jarrell-Henderson* case.

*MacMillan, Elliott,* and *Jarrell-Henderson* presume that a rejection must be on the record at least once for a reviewing court to consider evaluating, much less implementing, any later limitation on matching coverage. Other courts agree.[17] This record lacks the necessary factual predicate of a waiver. Because this record contains no explicit rejection to carry forward into the 2009-10 policy year, nothing in the cases discussed above suggests a finding that reduced coverage should apply.

### b.    Ambiguous Rejections

Some courts now emphasize substantial compliance with the rejection requirement, rather than a hypertechnical reading of the statute. Often, these cases involve ambiguous rejections. Progressive touts these cases as a means through which this Court can find in its favor. Because these cases rest their findings on the existence of some sort of rejection, even if defective, and no rejection exists here, they cannot support a finding in Progressive's favor.

In cases where only an ambiguous rejection existed, courts have been persuaded that other evidence can demonstrate rejection of matching limits. For instance, in *Jefferson v. Harco National Insurance Co.*, the policyholder ambiguously checked two boxes on the first form offered, indicating it sought both matching and minimum UM coverage. 2009 WL 1765670, at

---

[17] *Melton*, 760 F. Supp. 2d at 635 ("Under § 38.2-2206, an insured's UM/UIM coverage limits *will equal* his liability coverage limits unless he rejects this coverage and elects a lesser amount.") (emphasis added); *Canal*, 543 F. Supp. 2d at 522, 526 (no dispute that insured sought to continue with lower UM limits, court found that two valid rejections of matching coverage trumped a subsequent renewal form where matching limits were mistakenly checked off).

*6. Despite this ambiguity, the parties operated on the lower, minimum, amount for years. *Id.* at

*8. When looking at the policy year at issue, the court noted that post-*White* and *Bray* case law

afforded flexibility in looking to the actions and intent of the parties to evaluate "whether a

waiver form has in fact expressed a rejection of coverage." *Id.* Among other things, the Court

found that a recent oral agreement to set UM limits at one hundred thousand dollars (which was

below matching liability limits but above the earlier minimum) supported a finding that the

earlier rejection of matching limits could stand.[18] *Id.*

Clearly, the course of dealing in *Jefferson* stands in contrast to that between Santens and

Progressive. This record patently establishes that Santens never signed a waiver form, instead

requesting an increase in liability limits after having explicitly sought, and having received,

double the minimum UM limits. In 2009, both parties failed to address the effect of increased

liability on UM limits. Santens's silence, cannot, as a matter of law, constitute his first rejection

of matching limits. This is especially true because this Court must construe any ambiguity about

coverage "in favor of the insured." *Id.* at *5 (citations omitted).

Because Section 2206(A) mandates matching coverage, this lack of rejection or waiver

supports a finding that an expressed desire to increase BI limits should result in a concomitant

increase to and match of UM limits just as an explicit rejection would. "[T]here must be a

rejection or the uninsured and underinsured limits will equal liability limits[.]" *Melton*, 760 F.

Supp. 2d at 639 (citation omitted) (internal quotation marks omitted).

---

[18] Other cases have made similar findings. *See Alexander*, 445 S.E.2d at 147 (Supreme
Court of Virginia case finding that a valid 1984 waiver of matching UM coverage remained in
effect in 1991 because "once the insured has effectively reduced the level of coverage by
notifying the insurer, in accordance with [Section 2202(B)], the waiver and reduction of
coverage remains in effect during subsequent renewals of the policy.").

**D.     The After the Fact Policy Declarations and Premiums Paid Cannot Cure the Finding that No Meeting of the Minds or Mutual Intent to Reject Matching UM Coverage Exists**

Finally, Progressive attempts to demonstrate a mutual intent to reduce UM coverage by pointing to the subsequent declaration pages sent to Santens that reflected a lower amount of UM coverage. Progressive also suggests that the declaration pages show a reduced premium reflecting the agreement to reduce coverage. Both arguments fail. This Court cannot find that the declaration pages and premiums paid demonstrate Santens rejected or intended to reject matching coverage.

Although Progressive sent Santens declaration pages reflecting mismatched coverage after the April 2009 Call, Progressive cannot establish an agreement at the time of the call to reject matching UM coverage and change the terms of the policy without some earlier indicia of agreement from Santens.[19]  In light of the silence during the April 2009 Call, the declaration pages reflecting mismatched coverage and the payment of lower premiums do not eliminate the requirement to follow the mandatory dictates of Section 2206(A). Such after-the-fact conduct cannot sustain a finding of a meeting of the minds or mutual intent to reject matching UM coverage in 2009.

### 1.     Declaration Pages

Progressive impermissibly asks this Court to conclude that Santens rejected or intended to reject matching UM coverage as a result of his acceptance of policy declarations from 2009-2012 that purported to provide five hundred thousand dollars ($500,000) CSL liability coverage

---

[19] As noted above, Progressive looked for a waiver form when evaluating the claim. One claims representative wrote, "[i]f we can't produce waiver form signed then we will have to provide $500k [combined single limits]." (*See* Claims Notes 8 (capitalization corrected).)

This Court does not consider this claim file note as an admissible statement about the law. However, factually, the Court notes that the existence of a waiver form – or its absence – provides relevant information regarding a meeting of the minds. The lack of a waiver produces an inference that no agreement to reduce limits existed.

and fifty-thousand dollars ($50,000) each person/one hundred thousand dollars ($100,000) each accident UM coverage.  Just as the insurer in *Bray* could not construe the insured's acceptance of UM policy limits below the statutory minimum as an affirmative rejection of matching coverage, Progressive cannot construe Santens's acceptance of declarations issued after the April 2009 Call that reflect non-matching coverage as an affirmative rejection of matching coverage at the time of the increase in BI coverage.  As in *Bray*, and unlike *Jefferson, Jarrell-Henderson, Alexander, Hall*,[20] *MacMillan, Elliott*, and *Canal*, no other evidence of rejection, and no written waiver, exists.

Although Progressive mailed declarations articulating a UM limit lower than the five hundred thousand dollars ($500,000) liability coverage Santens procured, this subsequent act by Progressive cannot undergird a finding of mutual intent of the parties at the time of the phone call.  The silence of both parties in 2009 on the matching UM coverage cannot, as a matter of law, constitute Santens's first rejection of matching UM limits.

### 2.    Premium Amounts

Progressive also contends that Santens "enjoyed a significantly lower premium payment because of his lower UM/UIM limits." (Def.'s Mem. Supp. Mot. Summ. J. 15, ECF No. 38.) The Court finds any reference to the premiums Santens paid unpersuasive because a review of the declarations demonstrates Santens *never* paid the same premium, for either BI or UM coverage, at any point during the existence of the policy.  For example, the 2007 Declaration

---

[20] In *Hall*, the Supreme Court of Virginia found that an insured waived matching UM coverage even where the policy holder submitted the UM waiver more than twenty days after receiving it.  The *Hall* court noted that "subsequent actions by both [the insurer and policy holder] were consistent with an agreement for the lower amount of uninsured motorist coverage." 533 S.E.2d at 618.  The court noted that the policy holder signed and returned a waiver form which clearly indicated a desire for UM under her policy liability amount. *Id.* The *Hall* court took into account a reduced premium rate when noting circumstances supporting an intent to waive. *Id.* Nothing in *Hall* would permit this Court to find mutual intent without the other indicia, such as a signed waiver, evident in *Hall*.  No written waiver or rejection exists.

reflects a $147 premium for bodily injury liability and an $84 premium for UM bodily injury coverage. The 2009 Declaration that reflects the increased BI limit lists a $135 premium for the bodily injury portion of the policy and a $66 premium for UM coverage, both lower than the 2007 rates. Nothing in the record suggests what Progressive would have charged or what Santens would have paid for higher UM coverage. This inconsistent and incomplete record with respect to the premiums paid cannot, as a matter of law, demonstrate Santens's intent to reject matching UM coverage.

Thus, neither the declaration pages nor the premium amounts can, as a matter of law, be used to establish a rejection in the absence of other evidence of intent to reject. This is especially true when the insured doubled minimum levels of coverage when asked, and the parties remained silent as to the effect on UM limits when liability was increased. In the absence of a prior rejection of matching UM coverage that remains in effect after Santens increased his BI coverage in 2009, Section 2206(A) mandates matching UM coverage at the increased level.

### IV.  Conclusion

For the foregoing reasons, the Court GRANTS Santens's cross motion for summary judgment (ECF No. 34) and DENIES Progressive's cross motion for summary judgment (ECF No. 37). The UM coverage in effect at the time of the Accident was five hundred thousand dollars ($500,000) CSL.

An appropriate Order shall issue.

_____/s/_____
M. Hannah Lauck
United States District Judge

Richmond, Virginia
Date:  7-11-14